PAUL HITTERMAN, Acting Regional
Director of Region 13 of the National
Labor Relations Board, for and on behalf
of the National Labor Relations Board,

No. 17 C 2616

Petitioner,

Judge Thomas M. Durkin

v.

UNIVERSAL SECURITY, INC.,

Respondent.

## MEMORANDUM OPINION AND ORDER

Paul Hitterman, the Acting Regional Director of Region 13 of the National Labor Relations Board (the "Director"), has filed a petition seeking a preliminary injunction requiring Universal Security, Inc. to rehire two employees, Marcie Barnett and Sadaf Subijano, while administrative proceedings seeking the employees' reinstatement are proceeding before the National Labor Relations Board (the "Board"). Universal provides security services at O'Hare Airport, where Barnett and Subijano worked as security guards. The Director argues that they were fired because they participated in union organizing activities and spoke to the press about a strike and their working conditions, in violation of Section 8 of the National Labor Relations Act (the "Act"). Universal argues that they fired Barnett and Subijano because their statements to the press revealed "sensitive security information" ("SSI") in violation of federal regulations, and that by publicizing their identities as airport security guards, Barnett and Subijano became vulnerable to

influence by those seeking to attack the airport. For the following reasons, the petition is granted.

## Background

The Service Employees International Union (the "Union") filed charges with the Board against Universal alleging, among other charges, that Universal violated Section 8 of the Act by firing Barnett and Subijano. The Board investigated the charges and based on that investigation the Director filed a complaint with the Board against Universal on December 23, 2016. Universal sought summary judgment before the Board, which the Board rejected on April 3, 2017. That same day, the Board authorized the Director to seek injunctive relief. The Director filed this petition three days later on April 6, 2017. A hearing was held before an administrative law judge on May 9-10, 2017. The testimony and exhibits from that hearing constitute the record that is the basis for the Director's petition for injunction relief here. A decision on the merits from the administrative law judge is pending. This Court heard oral argument on June 29, 2017.

1.    **The Employees**

Through 2016, the Union was working to unionize Universal employees. According to Sarah Sahed, the Union's Midwest organizing coordinator, Barnett and Subijano were leaders in the unionization campaign because of "their participation through attending meetings, speaking to their coworkers, moving petitions, attending events, and actions inside and outside of the airport." R. 23-2 at 123

(122:1-4).[1] Barnett testified that she attended between eight and ten union meetings and two strikes prior to being fired. *Id.* at 25 (24:1-7). Subijano testified that she began her involvement with the union in 2015, attended seven or eight meetings, and participated in two strikes. *Id.* at 67 (66:4-18).

## 2. Statements to the Media

Barnett and Subijano participated in a strike on March 31, 2016, during which they made statements to the media. Barnett made the following statement, which was transcribed and posted on the internet:

> I'm a security officer with Universal Security. I guard entranceways at the airport and ensure no one gets through that's not supposed to be there. We are also called to secure doors on the concourse, screen IDs for employees . . . and log in vendors. I keep the airport safe. I'm fighting out here for today for you, the public, and myself. We are on an unfair labor practice strike because when we came together for a fifteen dollar living wage our employer retaliated against us. O'Hare workers need a living wage and health care for out – to raise our families. I want to be able to help my daughter get through college and I want to do things with my granddaughter such as take her to Navy Pier on a ferris wheel, Shedd Aquarium and to also visit her uncles in Nebraska and Georgia, I would like to fly there. But instead I am struggling to put food on the table, and buying seven-day bus passes to work, it's like robbing Peter to pay Paul, how unfortunate.

---

[1] To the extent this testimony may be hearsay, it is well established that hearsay testimony is admissible in preliminary injunction hearings. *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction."); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 762 (N.D. Ill. 2016) ("Settled law . . . permit[s] a district court to consider hearsay at the preliminary injunction stage."); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."). Additionally, Universal has not objected to the admissibility of this testimony for purposes of the Court deciding the Director's petition.

R. 23-5 at 145. The following statements were attributed to Subijano by various newspapers:

> [Subijano] . . . feels unprepared in an emergency, particularly pertinent in light of the Brussels attack, and wants more training on how to respond.
>
> "We don't have nothing much but a radio to communicate with command center," Subijano said. "I don't think that's enough."

*Id.* at 152 (Chicago Tribune).

> In particular, they say they aren't instructed properly in how to deal with real security threats such as a terrorist attack.
>
> "All we have is the radio," Subijano said Wednesday.
>
> After workers aired those complaints earlier this month to city Aviation Commissioner Ginger Evans, Universal Security followed up by showing its workers a Homeland Security video titled "Run! Hide! Fight!"
>
> The video was released four years ago as a way to advise members of the public about what to do if caught in an active-shooter situation, the main takeaway being you ought to try to get away quickly.
>
> I've linked to the video on our website so you can judge for yourself whether this is the sort of "training" you would expect in an emergency for uniformed airport security, even for the third string.

*Id.* at 155-56 (Chicago Sun-Times).

> "We need critical training to protect ourselves, other workers and our passengers when emergencies happen" Sadaf Subijano, a security guard at Chicago's O'Hare International Airport said. She said the Brussels attacks "should be a wake-up call for everybody."

*Id.* at 158 (Washington Post).

### 3.    Barnett and Subijano Are Fired

Both Barnett and Subijano were fired on April 13, 2016. R. 23-5 at 164-65. Their termination letters explained that they were fired because they "repeatedly spoke[] to a number of media outlets over the past several weeks regarding the details of [their] security work at O'Hare . . . . [and their] comments have included sensitive security information." *Id.* The termination letters did not specifically reference any statements in particular.

### 4.    The TSA Issues Warning Notices

In August 2016, the Transportation Security Administration ("TSA") issued a "Warning Notice" to Universal in connection with Barnett's and Subijano's statements. The federal regulations governing the TSA define "Warning Notice" as a notice "that recites available facts and information about the incident or condition and indicates that it may have been a violation," but "does not constitute a formal adjudication of the matter." 49 C.F.R. 1503.301(b)(1). The warning notice the TSA issued to Universal stated that

> on April 18, 2016, TSA at [O'Hare] became aware via a Chicago Tribune article dated April 15, 2016, that two [Universal] employees employed as contractors at [O'Hare] released [SSI] to the media and possibly other individuals. No notification informing TSA of this unauthorized release of SSI was made by the Chicago Department of Aviation or [Universal].
>
> This incident may have represented a failure on the part of [Universal] at [O'Hare] to comply with 49 CFR 1520.9(c), which requires that when a covered person becomes aware that SSI has been released to

unauthorized persons, the covered person must promptly inform TSA . . . .

R. 23-5 at 166. The Chicago Tribune article referenced in the TSA's warning notice included a photograph of Subijano and identified her as a "security officer" at O'Hare. R. 23-4 at 502. The article quoted the termination letter Universal provided Subijiano as stating that she was fired because her "comments [to the media] have included sensitive security information." *Id.* at 503. The article went on to report that "[i]n comments to the Tribune [on] March 31, Subijano complained about a lack of paid sick days, retaliation for organizing and inadequate security training. She said officers have only a radio to communicate with the command center." *Id.*

TSA also issued "Warning Notices" to Barnett and Subijano through their counsel at the Union. These notices stated that TSA had conducted an "investigation . . . in regard to media reports indicating your client disclosed SSI to the media resulting in [their] termination from [Universal]." R. 23-5 at 168-69. The notices provided that the warning was being issued because "[t]his incident may have represented a failure on your part to comply with 49 CFR 1520.9(c), which requires that when a covered person becomes aware that SSI has been released to unauthorized persons, the covered person must promptly inform TSA . . . ." *Id.* A "covered person" under 49 C.F.R. § 1520.7(j) includes "[e]ach person who has access to SSI," which plausibly includes Barnett and Subijano.

### 5. Effect on the Union

Universal's counsel represented at oral argument that Universal employs about 200 people at O'Hare. The Union invited Universal employees to at least

seven meetings leading up to the strike on March 31, 2016. *See* R. 23-4 at 430-39. An average of 12 Universal employees attended those seven meetings. *See id.*; R. 23-2 at 111-19 (110:6–118:20). The strike on March 31, 2016 was attended about 100 O'Hare employees, and between 15 to 20 of the 100 were Universal employees. *See* R. 23-2 at 120-22 (119:1–121:1).

After Barnett and Subijano were fired on April 13, 2016, the Union held 13 meetings between May 20 and November 1, 2016. *See* R. 23-4 at 448-96; R. 23-2 at 127-142 (126:7–141:23). An average of 2.15 Universal employees attended each meeting. *See id.* The Union organized another O'Hare strike in November 2016, which was attended by approximately 300 O'Hare workers. R. 23-2 at 145 (144:7-10). None of the workers who participated in the strike were employed by Universal. *Id.* (144:13-15).

## Analysis

The Director seeks a preliminary injunction ordering Universal to rehire Barrett and Subijano until the Board finally adjudicates the Union's charges against Universal. "Under [Section] 10(j) of the Act, courts may grant temporary injunctions pending the Board's resolution of unfair labor practice cases." *Harrell v. Am. Red Cross, Heart of Am. Blood Services Region*, 714 F.3d 553, 556 (7th Cir.2013). "The idea underpinning 10(j) is that a district court can issue a speedy preliminary injunction to protect a union where the effective enforcement of [the Act] is threatened by the delays inherent in [the Board's] dispute resolution process." *Ohr v. Latino Exp., Inc.*, 776 F.3d 469, 472 (7th Cir. 2015). "The goal is to

protect the integrity of the collective bargaining process and to preserve the Board's power to provide effective remedies for violations despite the 'notoriously glacial' pace of Board proceedings." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011).

The Seventh Circuit has held that courts applying Section 10(j) should use "the same factors to which [they] look[] in other contexts when deciding whether to grant injunctive relief." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499-500 (7th Cir. 2008). Those factors are the following: "(1) [the Board] has no adequate remedy at law; (2) the Union will be irreparably harmed without interim relief, and that potential harm to the Union outweighs potential harm to the employer; (3) public harm would occur without the relief; and (4) the Board has a reasonable likelihood of prevailing." *Am. Red Cross*, 714 F.3d 553, 556 (7th Cir. 2013). "The Director bears the burden of establishing the first, third, and fourth of these circumstances by a preponderance of the evidence." *Spurlino Materials*, 546 F.3d at 500. By contrast, the extent of the Director's burden to demonstrate irreparable harm varies inversely with the strength of the Director's case on the merits. *Id.* (that burden "is evaluated on a sliding scale"); *see also Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) ("the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief"). Ultimately, "plaintiff seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 375

(2008) (emphasis in original). Since the Director's burden to show that any harm the Union faces outweighs any harm Universal faces is evaluated in light of the strength of the Director's case on the merits, the Court will balance the harms last.

### 1. Inadequate Remedy at Law

"In § 10(j) cases, the 'adequate remedy at law' inquiry is whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order." *Am. Red Cross*, 714 F.3d at 557. "The longer that an employer is able to . . . avoid bargaining with a union, the less likely it is that the union will be able to . . . represent employees effectively once the NLRB issues its final order." *Id.* "This risk is particularly true in cases involving fledgling unions, where the passage of time is especially critical." *Spurlino Materials*, 546 F.3d at 501.

The Director contends that there is no adequate remedy a law for the chilling effect on the other employees' willingness to participate in Union activities in light of Barnett's and Subijano's terminations after speaking out at a strike. R. 26 at 5. As noted above, Universal employees have participated in Union activities at a drastically reduced rate since Barnett and Subijano were fired. Most notable, nearly 20 of Universal's employees participated in the strike on March 31, 2016, but none participated in a similar strike of O'Hare workers in November 2016. Additionally, the Union representative testified that fourteen individuals told her they feared retaliation if they continued to participate in the unionization efforts.

This evidence demonstrates that harm to the Union's organizing activities has already occurred. It is likely that without immediate injunctive relief, the Board's action to enforce the Act will be ineffective. Thus, the Director has demonstrated harm for which there is no adequate remedy at law.

## 2. Public Interest

"The interest at stake in a § 10(j) proceeding is the public interest in the integrity of the collective bargaining process." *Am. Red Cross*, 714 F.3d at 557. "The public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Spurlino Materials*, 546 F.3d at 502.

Here, the harm posed to the Union by allowing Barrett's and Subijano's terminations to stand is readily apparent. As discussed, the evidence shows that organizing activity has already become less popular among Universal's employees since the terminations. It is in the public interest to return Barnett and Subijano to their positions in order to send a message to Universal's employees that federal law protects their organizing activities.

## 3. Likelihood of Success

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [the party] must only show that [its] chances to succeed on [its] claims are 'better than negligible.'" *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). The

Seventh Circuit has described this as "a low threshold." *Whitaker*, 858 F.3d at 1046. Success on the merits in a complaint for violation of Section 8 of the Act requires the Director to prove "that the terminations were motivated by a desire to thwart protected activity." *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996). "Once the Director meets [this] burden, the burden shifts to the employer to demonstrate . . . that [it] would have terminated the employees irrespective of the protected activity." *Id.*

There is no dispute that Barnett and Subijano were fired because of the statements they made to the press during the March 31 strike. The dispute here is about the reason Universal decided those statements constituted a fireable offense: was it because the statements were made as part of Barnett's and Subijano's activities as union organizing leaders, or because they revealed SSI? If there is a reasonable argument that the statements did not reveal SSI, then there is an equally reasonable argument that Barnett and Subijano were not fired because they revealed SSI, but because of their union involvement.

A number of facts undermine Universal's explanation for the terminations. First, it is not clear that Barnett and Subijano revealed SSI. Notably, the termination letters did not specifically identify what SSI Barnett and Subijano revealed. Universal now argues that they revealed SSI in that they "identified themselves as individuals with unescorted access to secure areas of the airport, disclosed training materials and methods, and identified the secure communication

equipment used on the airfield." R. 27 at 2. The relevant federal regulation defines

SSI in relevant part as the following:

> (4) Performance specifications. Any performance specification and any description of a test object or test procedure, for—
>
> (ii) Any communications equipment used by the Federal government or any other person in carrying out or complying with any aviation or maritime transportation security requirements of Federal law.
>
> \*        \*        \*
>
> (8) Security measures. Specific details of aviation, maritime, or rail transportation security measures, both operational and technical, whether applied directly by the Federal government or another person, including—
>
> (i) Security measures or protocols recommended by the Federal government; . . .
>
> (iv) Any armed security officer procedures issued by TSA under 49 C.F.R. part 1562.
>
> \*        \*        \*
>
> (9) Security screening information. The following information regarding screening under aviation or maritime transportation security requirements of Federal law:
>
> (i) Any procedures, including selection criteria and any comments, instructions, and implementing guidance pertaining thereto, for screening of persons, accessible property, checked baggage, U.S. mail, stores, and cargo, that is conducted by the Federal government or any other authorized person.
>
> (ii) Information and sources of information used by a passenger or property screening program or system, including an automated screening system.
>
> (iii) Detailed information about the locations at which particular screening methods or equipment are used, only if determined by TSA to be SSI.
>
> \*        \*        \*
>
> (10) Security training materials. Records created or obtained for the purpose of training persons employed by, contracted with, or acting for the Federal government or

another person to carry out aviation, maritime, or rail transportation security measures required or recommended by DHS or DOT.

(11) Identifying information of certain transportation security personnel.
(i) Lists of the names or other identifying information that identify persons as—
(A) Having unescorted access to a secure area of an airport, a rail secure area, or a secure or restricted area of a maritime facility, port area, or vessel.
(B) Holding a position as a security screener employed by or under contract with the Federal government pursuant to aviation or maritime transportation security requirements of Federal law, where such lists are aggregated by airport.

49 C.F.R. § 1520.5(b).

Subijano's statements, as quoted in press articles, did not mention her access to secure areas of the airport. She stated that she was equipped with "nothing . . . but a radio," but she did not reveal any "specifications" about the radio or how it is "tested," as referenced in subsection (4)(ii) of the regulation quoted above. The article discussed a training video, and implied that it was the training video Subijano watched. But there are no quotes from Subijano about the video in the articles. Moreoever, the article notes that the video is publicly available, so it is not reasonable to say that Subijano "revealed" any information about her training even if she was the source of the information about the video.

Barnett did not discuss her training or equipment at all. She stated that she guarded "entranceways at the airport," including "secure doors" used by employees and vendors. Barnett, however, did not state that she was posted at secure entrances by herself, and she did not reveal whether she has complete discretion to

permit people to enter secure airways. Thus, her statements do not unambiguously reveal that she has or can provide "unescorted" access to secure areas. Furthermore, Universal security guards like Barnett and Subijano wear badges that display their names. *See* R. 23-2 at 37-38 (36:20–37:17) (Barnett testimony); *id.* at 69 (68:2-10) (Subijano testimony); R. 23-3 at 69 (348:2-14) (testimony of Tim Mayberry, Universal's Project Manager for Airport Systems). Thus, their identities as airport security guards were already publicly available before they made their statements to the press. Universal's contention that it thought Barnett's and Subijano's identities were SSI is belied by that fact Universal requires them to display their identities publicly.

Universal argues that the warning notices TSA issued to it, Barnett and Subijano, demonstrate that TSA believes Barnett's and Subijano's statements disclosed SSI. It may be that TSA would find that the statements disclosed SSI. But the "warning notices" do not constitute a final adjudication of any issue, nor do they include any analysis of Barnett's and Subijano's statements with respect to the regulatory definition of SSI. Thus, the TSA's warning letters are not dispositive evidence the TSA's opinion on this issue.

Rather than serve as evidence that Barnett and Subijano disclosed SSI, the TSA's warning notices state that *Universal* may have failed to follow federal regulations setting forth Universal's obligations in a case of SSI disclosure. The TSA notices indicate that Universal is under an obligation to report disclosure of SSI to TSA, and that the Chicago Tribune article suggested that Universal failed to fulfill

this obligation. At oral argument, Universal's counsel argued that Universal was "stunned" by Barnett's and Subijano's statements, and because they were so out of the ordinary, it took two weeks for Universal to determine the appropriate course of action. Universal's failure, after a two week investigation, to discover that it had an obligation to report the disclosure of SSI to TSA, undermines Universal's contention that it fired Barnett and Subijano because they disclosed SSI. There is a reasonable argument that if Universal had in fact made a determination that Barnett and Subijano disclosed SSI, then Universal would also have fulfilled its obligation to disclose the incident to TSA. This failure calls into question Universal's motives in firing Barnett and Subijano.

Universal argues that Barnett's and Subijano's statements threatened the safety of the airport. But the two week delay in their dismissal undermines this argument as well. Universal argues that it is primary concerned with the safety implications of Barnett and Subijano publicly disclosing their identities as airport security guards. But this conclusion requires no significant analysis. If public disclosure of employees' identities is such a clear and present security risk, Universal should have fired Barnett and Subijano the moment their identities appeared in the newspaper (and not required security guards to wear nametags). But Universal waited two weeks to fire them. A statement disclosing information that clearly implicated airport security should have resulted in immediate termination, not the two weeks of consideration that occurred here.

The ambiguity of the statements in question, and the evidence undermining Universal's alleged motives, create a reasonable argument that Universal terminated Barnett and Subijano because of their public involvement in union organizing, and not because they disclosed SSI. This is sufficient to demonstrate at least a "better than negligible" chance of success on the merits.

4.     **Balance of Potential Harms**

A.     **Irreparable Harm to the Union**

"[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011). In addressing whether there is an adequate remedy at law, the Court has already reviewed evidence indicating that Barnett's and Subijano's terminations chilled union organizing activity among Universal's employees at O'Hare. This evidence also serves to demonstrate that the Union is likely to suffer irreparable harm.

Universal contends, however, that the Director's delay in filing for the injunction and his actions to postpone the ALJ hearings shows this is not a case where a 10(j) injunction is appropriate or necessary. *See* R. 27. But the nearly 12 month delay in this case between Barnett's and Subijano's terminations and the filing of the Director's petition for injunctive relief is not unusual. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) (two years); *Frankl*, 650 F.3d at 1363 (three years); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850,

856 (5th Cir. 2010) (19 months); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (18 months); *Hirsch v. Dorsey Trailers*, 147 F.3d 243, 248-49 (3d Cir. 1998) (14 months).

Universal cites a court in this district denying a petition, in part, because the Board's "knowledgeable [15 month] delay implies that any harm the . . . employees face is neither urgent nor exclusive to administrative delay." *Sung Ohr v. Arlington Metals Corp.*, 148 F. Supp. 3d 659, 674 (N.D. Ill. 2015). That case, however, concerned an already-established union from which the employer withdrew recognition as a tactic to end collective bargaining negotiations. The Board in that case sought an injunction ordering the employer back to the bargaining table. The court in *Arlington Metals* noted that such an order would not work to "preserve the status quo," but would "accelerate[] what at this point only may be the ultimate remedy." *Id.* at 674. This is distinguished from the case here where there is evidence that Universal's terminations of Barnett and Subijano are an existential threat to a fledging union. Additionally, in *Arlington Metals*, the administrative law judge had already issued a decision in the union's favor by the time the Board sought an injunction. The district court found that "the normal administrative process which is well under way will constitute adequate relief," so that "time is not of the essence." *Id.* at 675. By contrast, here the administrative hearing is only recently concluded and it is impossible to predict when the administrative law judge will issue a decision. The fragility of the process to unionize Universal's employees,

combined with the fact that the administrative proceedings are not as far along, distinguishes this case from *Arlington Metals*.

For these reasons, the Court finds that the Director has demonstrated a likelihood of irreparable harm, despite the twelve month delay between the incident at issue and the filing of the petition for injunctive relief.

## B.    Potential Harm to Universal

The demonstrated harm to union organizing activity protected by the Act must be balanced against any potential harm Universal faces from reinstatement. Universal argues that a reinstatement order would harm it because it will be left "unable to effectively enforce federal and state laws related to SSI and confidential information." R. 27 at 15. But this argument assumes Universal's conclusion that Barnett and Subijano disclosed SSI. Whether this conclusion was justified is what is at issue in this case. Universal's ability to enforce relevant regulations will be protected if the Board and federal court ultimately determine that those regulations take precedence over laws protecting labor organizing. Thus, this asserted harm carries no weight.

At oral argument Universal also argued that reinstatement might require it to terminate current employees. But Universal employs almost 200 employees at O'Hare, and Universal's counsel admitted at oral argument that there is certainly an "ebb and flow" to Universal's staff at O'Hare. For these reasons, the Court does not consider Universal's burden to make personnel decisions a serious potential harm to Universal.

Although not a harm to Universal as an employer, Universal argues that reinstatement will threaten the safety of the airport. As discussed, Universal's own actions belie this argument. Furthermore, if safety is truly implicated, the Court would expect the TSA to have said so. None of the three warning notices TSA issued in this case address Barnett's or Subijano's potential continued employment. Nor has TSA intervened in this case—whether as a party or amicus—to address that issue with the Court.

### C.    Balancing & Burden

For these reasons, the Court finds that the balance of the harms tips almost entirely in the Director's favor. Accordingly, the Director has more than met his burden to demonstrate likelihood of success on the merits.

### Order

For the foregoing reasons, the Petition [1] is granted.

The Respondent, Universal Security, Inc., its officers, agents, successors and assigns, shall cease and desist from:

a) Discharging, suspending, or otherwise discriminating against employees because they engaged in concerted protected activity;

b) Maintaining or enforcing its rule prohibiting employees from speaking to the media;

c) In any like related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act.

Further, Respondent, its officers, agents and representatives shall:

a) Within in five days from the date of this Order, offer, in writing, Sadaf Subijano and Marcie Barnett immediate reinstatement to their former positions, or, if their positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed and displacing, if necessary, any employee who has been hired or reassigned to replace them;

b) Temporarily expunge any references to the discharges of Marcie Barnett and Sadaf Subijano from their personnel files and not rely on such discharges in any future discipline imposed prior to a final order from the National Labor Relations Board;

c) Within seven days from the date of this Order, post copies of this Order at all locations where Respondent's noticed to employees are customarily posted; maintain such notices free from all obstructions or defacements pending the National Labor Relations Board's administrative proceeding; and grant to agents of the National Labor Relations Board reasonable access to the Respondent's facility to monitor compliance with this posting requirement;

d) Within twenty days of the issuance of this Order, file with this Court and serve a copy upon the Regional Director of Region 13 of the National Labor Relations Board, a sworn affidavit from a responsible official which describes with specificity how the Respondent has

complied with the terms of this decree, including the exact locations where the Respondent has posted the materials required under this Order.[2]

ENTERED:

_Thomas M. Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: August 17, 2017

---

[2] Nothing in this Order should be construed as absolving Universal employees from complying with TSA and other applicable federal and state regulations.