JPL/WPB:tjc                                                                                                                    673-15-8

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| PAUL HITTERMAN, ACTING REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) | |
| | ) | No.: 1:17-cv-2616 |
| Petitioner, | ) ) ) | |
| v. | ) ) | |
| UNIVERSAL SECURITY, INC., | ) ) | |
| Respondent. | ) | |

## MOTION FOR RELIEF FROM JUDGMENT AND TO STAY THE EXECUTION OF THE COURT'S ORDER

Respondent, UNIVERSAL SECURITY, INC. ("Universal"), by its attorneys, John P. Lynch, Jr., William P. Bingle, and CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT, LLC., moves this Court for relief from judgment pursuant to Fed. R. Civ. P. 60 and to stay the execution of the Court's August 17, 2017 Order pursuant to Fed. R. Civ. P. 62 pending disposition of the motion for relief from judgment, and in support thereof states as follows:

1.  On motion and just terms, a district court may correct a mistake arising from oversight when one is found in the record and may relieve a party from a final judgment for such mistake and/or other reasons justifying relief. Fed. R. Civ. P. 60(a) & (b). A motion for relief from judgment is proper where the court has misunderstood a party. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990). Relief under Rule 60(b) is warranted upon a showing of extraordinary circumstances creating a substantial danger that the

judgment was unjust. *Dickerson v. Board of Educ. of Ford Heights*, 32 F.3d 1114, 1116 (7th Dist. 1994). Respectfully, Universal argues here that several key matters were overlooked and/or misunderstood in this Court's August 17, 2017 order and, as such, Court's judgment was unjust and should be vacated.

2. The predominant – and almost singular – focus in the Memorandum Opinion and Order is whether Subijano and Barnett disclosed sensitive security information ("SSI"). While they clearly disclosed SSI in their unfortunate statements to the media, this is not all they did wrong and was not the only basis for their terminations. Subijano and Barnett also disclosed confidential information in violation of state law and their training, which was an independent, sufficient cause for their terminations. This important issue was ignored by the Court – much as it was ignored by the petitioner. (Doc. 27, pp. 11-14.) Universal's argument did not hinge on a determination that Subijano and Barnett disclosed SSI – although they clearly did.

3. The Court noted early on in its decision that the terminations were due in part to disclosures by the complainants of the <u>details</u> of their security work at O'Hare, but its analysis of that issue stopped there. (Memorandum Opinion and Order, p. 5.) It was well established that Subijano and Barnett were trained that the <u>details</u> of their jobs were not to be disclosed to unauthorized persons. (Tr. 321.) Through this training process (mandated by the City of Chicago) they were aware that their job duties were confidential and were not to be disclosed to unauthorized persons. (Tr. 89, 321.) The Illinois Department of Professional Regulations ("IDPR") prohibits Universal's guards from disclosing confidential information learned within the course of their employment. Both Subijano and Barnett, however, admittedly disclosed such confidential information. (Doc. 27, pp. 9-11.)

Barnett admitted:

> Q. You identified yourself as somebody having access to security areas of the airport, true?
>
> A. Yes.
>
> Q. And that was a statement that was prepared well before it was given, correct?
>
> A. Yes.
>
> Q. And you didn't discuss with anybody, with Universal, or with the City or with TSA that you were going to give that statement, did you?
>
> A. No, I did not.

(Tr. 39-40.)

…

> Q. And you're advised that if you divulge confidential information or sensitive security information to people who are not otherwise authorized to know, that could lead to discipline, correct?
>
> A. Yes.

(Tr. 44-45.)

Subijano admitted:

> Q. And in the interviews you identified yourself as a security guard with Universal, correct?
>
> A. Yes.
>
> Q. And you identified yourself as somebody who worked out on the airfield, correct?
>
> A. Yes.
>
> Q. And you identified yourself as communicating with a radio, true?
>
> A. Yes.
>
> Q. In fact, you told Mr. Brown we have nothing but a radio with which to communicate with command center, correct?
>
> A. Yes.

(Tr. 74.)

…

> Q. Before you worked for Universal, you understood that your work as a security guard at the airport was confidential, true?
>
> A. Yes.

(Tr. 85.)

…

> Q. And you're instructed that that film [SIDA] is confidential, true?
>
> A. Yeah, everything is confidential.
>
> Q. Right. And during that film you're told that the detail of the airport security program should not be discussed with anyone other than those with authority to know, correct?
>
> A. Right.
>
> Q. You know through your training through Andy Frain and through McCoy and through the SIDA film that how you do what you do at the airport, in terms of security, is confidential, correct?
>
> A. Yes.
>
> Q. And by confidential, you're instructed not to share that with people -- that information with people who don't otherwise have an authority to know that information, true?
>
> A. Yes.

(Tr. 88-89.)

…

> Q. You knew that when you worked at Universal that if you disclosed sensitive information you could be terminated, correct?
>
> A. Correct.

(Tr. 94.)

Section 10(c) of the National Labor Relations Act (the "Act") states: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or

4

discharged…if such individual was suspended or discharged for cause." Aside from disclosing SSI, they clearly, admittedly, and repeatedly violated their instruction and training – and the law. They disclosed themselves as having access to the airfield and entranceways. Like the employer in *IBM Corp.*, 265 NLRB 638 (1982) who was found to have not violated the Act in terminating an employee for disseminating confidential information, which would normally have been protected activity, Universal had sufficient cause to terminate Subijano and Barnett for violations beyond their disclosures of SSI.

4. Subijano's and/or Barnett's statements have made themselves (and by extension O'Hare Airport) targets. In March of 2017, the FBI, the Department of Homeland Security, and the National Counterterrorism Center warned America's airlines and airports that they remain top targets for terrorists. The memorandum included a warning of the insider threat posed by airport employees giving outsiders access to secure areas and planes. Tom Winter and Andrew Blankstein, *Feds Remind U.S. Airports, Airlines They Are Terror Targets*, NBC News, March 22, 2017, http://www.nbcnews.com/news/us-news/feds-remind-u-s-airports-airlines-they-are-terror-targets-n737416. This is why security guards are trained to keep the details of their work confidential, and this is why guards who violate their training can no longer serve as guards.

5. The Court's rationale that Subijano and Barnett did not disclose SSI was based significantly on the fact that they wore name tags. But the ID badges required by the TSA and worn by all O'Hare employees, including Universal's guards, do <u>not</u> identify what areas of the airport the employee/guard has access to or what they do in those areas. (Tr. 57-58, 75-76.) The fact that Subijano and Barnett worked on the airfield and policed entranceways became public knowledge only when they disclosed that information. Perhaps the name of a security guard can be determined by looking at his or her badge. But even a thorough visual inspection of a

5

Universal guard's badge cannot uncover either the areas of the airport to which that guard has access or that guard's duties. The badge simply does not supply that information, and the petitioner never claimed that it did. (Doc. 27, p. 14; Tr. 315.) The Court's decision in this case reveals the mistaken view that name tags disclose where the guard works and what he or she does. Yet there is no support for this in the record.

6. The Court opined that Subijano's media statements do not mention her access to secure areas of O'Hare but, respectfully, this is not accurate. Subijano's statements to the media, including, "Bam! I'm on the airfield," demonstrated that she had unescorted access to the airfield, a secure area of O'Hare. (Doc. 27, p. 12; Resp. Exs. 12, 13.) To be sure, we all know that airfields are secure areas. Barnett specifically stated, "*I* guard entranceways at the airport and assure that no one gets through that is not supposed to be there." (Doc. 27, p. 10.; emphasis added.) Neither mentioned requiring escorts for this work or working with anyone else. And, in any event, these statements contain details of the security work of Subijano and Barnett. It is uncontested that the details of their work were to be treated confidentially, and they were not.

7. The Court misinterpreted Universal's argument regarding Subijano's disclosure of the training video. The training video shown to Universal's guards was publicly available. However, it was not known that this video was used to train guards as until Subijano's made her public statement. (Resp. Ex. 14.) As such, this statement violated 49 C.F.R. § 1520.5(b)(10). Now that the use of this video as a training tool has been made public, those seeking to do the traveling public harm have information as to how guards are trained to react in response to certain threats. To be sure, this is valuable information to a terrorist. The disclosure of the use of the video was a disclosure of security details, confidential information and a violation of corporate training and policy.

8. Sarah Sahed's self-serving testimony that Subijano and Barnett were leaders in the unionization campaign is undermined by the meeting attendance sheets. Leading up to the March 31, 2016 strike, the union held seven organizing meetings: January 29, February 11, and March 3, 10, 16, 22, and 23. (GC Exs. 4-10.) Subijano attended organizing meetings on February 11 and March 10 and 16 (GC Exs. 5, 7-8) and Barnett attended on March 16, 22, and 23 (GC Exs. 8-10.). It is unlikely that two of the alleged leaders for unionization would each attend only three – less than half – of the organizing meetings prior to a highly publicized strike. In addition, the hearsay nature of Sahed's testimony was objected to repeatedly by counsel for Universal.

9. The General Counsel, who is required to establish that "[the Board] has no adequate remedy at law," has not produced any evidence to establish the current participation in the unionization effort by Universal's guards. *Am. Red Cross*, 714 F.3d 553, 556 (7th Cir. 2013); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008). The most recent evidence produced regarding union meeting attendance by Universal's guards is from December of 2016, more than eight months ago. Notably, Sahed stated that she had detailed information (even rankings) regarding airport employee participation in the union. This information was never produced. This lack of evidence prevents the General Counsel from establishing an inadequate remedy at law.

10. Universal has argued that the delay in filing the section 10(j) petition demonstrates that a temporary injunction is unnecessary. (See Doc. 27.) The Court disagreed with that argument and cites five cases in its memorandum opinion to support the premise that 10(j) petitions have been granted in cases with longer gaps between the violation and the filing of a petition. However, in each of the cases cited by the Court, there was significant evidence of

anti-union animus and/or the ALJ had already ruled in favor of the petitioner. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 277-281(7th Cir. 2001) (new owner of grocery store informed an employee that the store wouldn't remain a union store, said that she would not immediately recognize the existing union, and stated that she would hire only 50% of the former employees because she wouldn't have the union and couldn't afford it); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1359 (9th Cir. 2011) (ALJ found that employer had committed unfair labor practices because it bargained in bad faith and unilaterally changed terms and conditions of employment after it withdrew recognition from the union); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 849-850 (5th Cir. 2010) (ALJ found that an employer violated the Act where it told employees how to get rid of the union and informed employees that if they struck, they would be replaced); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 538 (4th Cir. 2009) (ALJ found that operator of coal mining facility systematically discriminated against union members by refusing to grant them interviews and instead filled vacant positions with inexperienced trainees and nonunion employees); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 246 (3rd Cir. 1998) (the ALJ found that the employer committed unfair labor practices where it threatened to close its plant if the workers called a strike; employer eventually did close the plant for that reason). The delay in filing a 10(j) petition was found to be acceptable in those matters because there was significant evidence and/or an administrative finding that anti-union animus had occurred. That is simply not the case here, as the only alleged evidence of anti-union animus is the timing of the terminations. These cases should not be afforded significant weight in the Court's opinion.

11. Notably, while the General Counsel has not been penalized for violating his own practices and waiting a year to seek injunctive relief, Universal has been penalized for waiting two weeks to terminate Barnett and Subijano after their disclosures of confidential information.

The Court expressed the view that if their disclosures were a security threat they would have been terminated immediately. There is substantial evidence in the record, however, that Universal was "stunned" by this misconduct and it took some time for Universal to evaluate the proper course of action. There is no evidence that Subijano and Barnett had access to secure areas of the airport at this time.

12. To recap, Subijano and Barnett were charged with, as Barnett said, the responsibility to "keep the airport safe." But on March 31, 2016 these security guards who work at what the FBI, the Department of Homeland Security, and the National Counterterrorism Center warned is one of the "top targets for terrorists" told the world in print, on the internet, and on television: (a) their names, (b) their employer's name, (c) what they look like (through pictures and video), (d) that they have access to the O'Hare Airport airfield (Subijano) and entranceways (Barnett), (e) what training videos Universal guards were trained with, and (f) that they communicate only with a radio on the airfield. It would be naïve to think that this information isn't in the files of the many terrorist organizations that are active across the world today and wreak havoc when presented with the slightest opportunity. What Barnett's and Subijano's disclosures provide is more opportunities for havoc. Their conduct was antithetical to what security guards are supposed to do. Without question, their conduct made the airport less secure, violated their training and state and federal law. The petitioner has failed to meet its burden and the Court's decision to the contrary should be reversed.

13. The reinstatement of Subijano and/or Barnett will create a security threat to O'Hare Airport and the traveling public, just as the statements of Subijano and Barnett did when they were made. That threat, along with the foregoing list of mistakes, misinterpretations, and misunderstandings, establishes a substantial danger that the Court's August 17, 2017

Memorandum Opinion and Order was unjust. For these reasons, this Court should grant Universal's requested relief from judgment.

14. The district court has discretion to stay execution of a judgment pending disposition of a Rule 60(b) motion on such conditions for the security (e.g. a bond) of the adverse party as are proper. Fed. R. Civ. P. 62(b); *Houben v. Telular Corp.*, 309 F.3d 1028, 1038 (7th Cir. 2002). Initially, there is no need for a bond here as there have been no monetary damages awarded. Four factors are used to determine whether a stay is appropriate pursuant to Rule 62(b): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *F.T.C. v. QT, Inc.*, 472 F.Supp.2d 990, 997 (N.D.Ill. 2007), citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

15. As demonstrated in the foregoing paragraphs, Universal has made a strong showing that its Rule 60(b) motion will succeed on the merits. Absent a stay, Universal will be required to post two guards at O'Hare that have knowingly disclosed confidential information and violated their instruction and training. In addition, reinstating Subijano and Barnett would undermine Universal's authority amongst its remaining guards, making it more difficult to enforce federal and state regulations, discipline and the terms of its contract with the City of Chicago. Issuance of the stay will not substantially injure the other parties in this proceeding, as there are no monetary damages at issue and all ordered relief will remain available. Indeed, the petitioner waited a year to bring this action. Finally, as stated above, there is a strong public interest in providing safe and secure airports for the traveling public which would be threatened

and undermined by reinstating Subijano and/or Barnett. For these reasons, this Court should stay the execution of its August 17, 2017 judgment pending disposition of the Rule 60(b) motion.

WHEREFORE, Respondent, UNIVERSAL SECURITY, INC., respectfully requests that this Honorable Court grant its Motion for Relief from Judgment pursuant to Fed. R. Civ. P. 60 and deny the Section 10(j) Petition of PAUL HITTERMAN, ACTING REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD, and stay the execution of the August 17, 2017 Order pursuant to Fed. R. Civ. P. 62 pending disposition of this Motion for Relief from Judgment, and for any other relief deemed appropriate by this Honorable Court

                                      CREMER, SPINA, SHAUGHNESSY, JANSEN
                                      & SIEGERT, LLC


                                        By: /s/ John P. Lynch, Jr.
                                            One of the Attorneys for Respondent


John P. Lynch, Jr.
William P. Bingle
CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT, LLC
One North Franklin
10th Floor
Chicago, IL 60606
(312) 726-3800
361425

## CERTIFICATE OF SERVICE

**PLEASE TAKE NOTICE** that on **September 1, 2017**, there was e-filed with the United States District Court, Northern District of Illinois, Eastern Division, on behalf of **Respondent, Universal Security, Inc.** its **Motion for Relief from Judgment and to Stay the Execution of the Court's Order,** copies of which are attached hereto and hereby served upon the following:

    **Courtesy Copy via hand delivery**: Honorable Judge Thomas Durkin

    **Via Electronic Mail**:    Nicholas Rowe
    Andrea James
    Helen Gutierrez
    Michele Cotrupe

Respectfully Submitted,

By: /s/ John P. Lynch, Jr.
One of the Attorneys for Respondent
CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT, LLC
One North Franklin, 10th Floor
Chicago, Illinois 60606
Tel: (312) 726-3800
Fax: (312) 726-3818
361425